IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAVID LEE DEANGELO, JR.,** : | CIVIL ACTION |
| Plaintiff, : | |
| : | |
| vs. : | NO.   20-cv-1766 |
| : | |
| **KILOLO KIJAKAZI,**[1] : | |
| **Acting Commissioner of Social Security,** : | |
| Defendant. : | |

## MEMORANDUM OPINION

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                                November 7, 2022

Plaintiff David Lee DeAngelo, Jr. (Plaintiff) brought this action seeking review of the Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) under Title II of the Social Security Act, 42 U.S.C. Sections 401 to 433.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 26) is **DENIED**.

## I.   PROCEDURAL HISTORY

Plaintiff protectively filed for SSDI, alleging disability since February 19, 2016, due to stroke paralysis on his right side.  (R. 63, 233).  Plaintiff's application was denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 81-87). Plaintiff, represented by counsel, and a vocational expert (VE) testified at the January 7, 2019 administrative hearing.  (R. 28-62).  On January 29, 2019, the ALJ issued a decision unfavorable to Plaintiff.  (R. 12-27).  Plaintiff appealed the ALJ's decision, and the Appeals Council denied

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been substituted for Andrew Saul as the Defendant in this case.

Plaintiff's request for review on March 3, 2020, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On April 7, 2020, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania. (Compl., ECF No. 2). On April 30, 2020, Plaintiff consented to my jurisdiction pursuant to 28 U.S.C. § 636(C). (Consent, ECF No. 5). On August 27, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 26). The Commissioner filed a Response on November 12, 2021. (Resp., ECF No. 29).

## II.  FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on March 22, 1960, and was 55 years old on the alleged disability onset date. (R. 208). Plaintiff graduated from high school and previously worked as a supervisor at a tractor trailer building company. (R. 234).

### A.  Medical Evidence

On February 19, 2016, Plaintiff presented to the Reading Hospital in West Reading, Pennsylvania, with right hand weakness, facial droop and slurred speech. (R. 288). He was admitted to the hospital. (*Id.*). An MRI showed an acute left lacunar infarct, a type of stroke, but no significant stenosis or occlusion within the intracranial circulation. (R. 288, 320-21). A chest x-ray showed no acute cardiopulmonary abnormalities. (R. 322). He was found to have mild weakness in his right upper extremity with abduction, most notable in his grip strength, rated as "4 to 4+ over 5." (R. 295). His facial droop and word slurring were described as "very mild" and "mild," respectively. (*Id.*). A CT scan showed that he did not have an intracranial mass or hemorrhage but that he had a stable posttraumatic deformity to the medial right orbital wall. (R.

297). On February 21, 2016, Plaintiff was discharged with mildly slurred speech and a weak but stable right upper extremity. (R. 287, 289).

On April 27, 2016, Plaintiff visited Gary Kolva, M.D., for mood and pain-related sleeping problems. (R. 367). Dr. Kolva increased his Gabapentin dosage. (*Id.*). Plaintiff returned on June 1, 2016. (R. 366). Dr. Kolva noted that at the time of his stroke Plaintiff suffered from slurred speech, ataxia and right upper extremity weakness, but that he had recovered, albeit with central pain syndrome and right shoulder pain radiating down to the wrist. (*Id.*). On examination, Plaintiff had clear speech with intact language function and full power in his upper right extremity. (*Id.*). Dr. Kolva increased Plaintiff's Neurontin dosage due to his pain and also prescribed Effexor. (*Id.*). On July 6, 2016, Dr. Kolva noted that Plaintiff had chronic pain and short-term memory deficits likely due to fatigue from his sleeping difficulties. (R. 393). Dr. Kolva prescribed Lamictal. (*Id.*). On September 14, 2016, Plaintiff reported modest improvement in his pain. (R. 392). Dr. Kolva increased his Effexor dosage, although he expressed concerns it could cause drowsiness. (*Id.*). He also noted a prescription for Adderall. (*Id.*). On December 14, 2016, Plaintiff again reported modest improvement with Effexor, which led Dr. Kolva to increase the dosage further. (R. 391). Plaintiff also complained of fatigue with leg dragging beginning in the early afternoon. (*Id.*).

On June 28, 2017, Plaintiff reported to Dr. Kolva that the pain in his arm was "much better" and that he wanted to return to work. (R. 390). Dr. Kolva responded that he should contact his insurance carrier and ask what must be done to return on a trial basis. (*Id.*). He further indicated that he would line up neuropsychological testing to determine if Plaintiff had any mental difficulties, although Dr. Kolva stated that he did not expect any significant issues given the location of Plaintiff's brain trauma. (R. 390). However, the subsequent testing showed "profound deficits in attention and information processing" that Dr. Kolva believed could make

3

it difficult to return to work in a supervisory role. (R. 389). On August 1, 2017, Dr. Kolva, Plaintiff and his wife discussed what they believed was the possibility of Plaintiff losing his short-term disability payments if he attempted to return to work but was unable to do so. (*Id.*). Dr. Kolva stated his hope that Plaintiff would be permitted to return to work if possible. (*Id.*). On October 31, 2017, Dr. Kolva noted that Plaintiff had started kayaking "to develop his musculature" and to fish again as "a more passive activity." (R. 388). Dr. Kolva indicated that he had "nothing else to offer him at this time" and that Plaintiff should return in six months. (*Id.*).

On March 29, 2018, Dr. Kolva completed a Medical Source Statement for Plaintiff. (R. 427-33). He identified Plaintiff's "positive objective signs" as including only impaired sleep and noted that his pain was frequently severe enough to interfere with his attention and concentration. (R. 427). He recorded that Plaintiff had marked limitations in the ability to deal with work stress but that in an eight-hour workday he could sit or stand and walk continuously for over three hours and sit[2] for over six hours total (the maximum options on the form). (R. 428-30). He indicated that Plaintiff could occasionally lift up to 20 pounds, but rarely or never more than that, and that he could constantly balance, stoop, assume different neck postures, reach bilaterally, and handle and finger with his left hand, but only occasionally with his right hand. (R. 431-32). He noted that Plaintiff did not require an ambulatory device but predicted that Plaintiff would miss work more than three times per month due to his symptoms. (R. 432-33).

Plaintiff returned to Dr. Kolva on November 30, 2018, for him to "fill out a form for [Plaintiff's] lawyer." (R. 437). In addition, Dr. Kolva referred Plaintiff to a rheumatologist for right shoulder and knee pain. (*Id.*). On this date, Dr. Kolva also completed another Medical

---

[2] Dr. Kolva did not indicate how long Plaintiff could stand and walk total in an eight-hour workday. (R. 430).

4

Source Statement. (R. 438-44). This time he identified Plaintiff's positive objective signs as including not only impaired sleep, but also slightly reduced range of motion, redness, swelling, muscle weakness and abnormal gait. (R. 438). He recorded that Plaintiff had severe limitations in the ability to deal with work stress and that in an eight-hour workday he could sit, provided his right leg was elevated, for five hours total and for one hour continuously before having to walk around for 15 minutes. (R. 439-40). He observed that in an eight-hour day Plaintiff could stand and walk for three hours total[3] but that he would have to take two-hour breaks to sit down. (R. 441). He indicated that Plaintiff could occasionally lift up to 5 pounds, but rarely or never more than that, that he could occasionally balance, assume different neck postures, reach and handle with his right hand, and that he could rarely or never stoop or finger with his right hand. (R. 441-42). He checked the lines on the form indicating that, with his left hand, Plaintiff could constantly reach, frequently handle and occasionally finger. (R. 443). He further noted that Plaintiff would occasionally require a cane to walk and stand for prolonged ambulation. (*Id.*). He repeated his prediction that Plaintiff would miss work more than three times per month. (R. 444).

The record also contains the June 24, 2016 report of state agency medical consultant Candelaria Legaspi, M.D. (R. 63-71). She found Plaintiff's statements regarding the intensity, persistence and functionally limiting effects of his symptoms only partially consistent with the record evidence because of Plaintiff's activities of daily living (ADLs), treatment (including medication) and the location, duration, frequency, and intensity of his symptoms. (R. 66). She determined that Plaintiff could occasionally lift and carry up to 20 pounds and frequently up to 10 pounds, sit or stand and walk up to six hours in an eight-hour day, frequently balance and

---

[3] Dr. Kolva did not indicate how long Plaintiff could stand and walk total continuously in an eight-hour workday. (R. 441).

5

climb ramps, stairs, ladders, ropes, and scaffolds, and handle, finger, feel, reach with his left hand, stoop, kneel, crouch, crawl, push and pull without limitation (other than the aforementioned weight restrictions), but that he could only frequently reach with his right hand. (R. 67-69). She further recorded that he had no visual, communicative or environmental limitations. (R. 69). Finally, Dr. Legaspi concluded that Plaintiff could perform his prior work as a supervisor of truck-trailer assembly. (R. 70). In reaching her conclusions, she noted Plaintiff's adequate range of motion, normal sensory faculties and full power in his extremities. (R. 68).

### B.  Non-Medical Evidence

The record also contains nonmedical evidence. In an Adult Function Report completed by Plaintiff's wife on March 29, 2016, she recorded that Plaintiff was capable of providing his own personal care, albeit solely with his left hand. (R. 241). She stated that Plaintiff did not drive, prepare meals, socialize, manage money or perform any housework or yardwork, although he did go grocery shopping with his family, watch television and listen to the radio. (R. 241-43). She checked boxes denoting that Plaintiff required a cane to ambulate and had limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stairclimbing, memory, completing tasks, concentration, understanding, following instructions and using his hands. (R. 245, 247). Plaintiff's wife noted that he could only walk 50 yards before needing to rest for 15 minutes, and could pay attention for 30 minutes. (R. 245). She indicated that he could not handle stress or changes in routine or follow written or spoken instructions well, but that he got along okay with authority figures. (R. 245-46).

Plaintiff worked briefly in late 2018, earning $630. (R. 227). The ALJ found that this work did not qualify as "substantial gainful activity" but considered it relative to its consistency of the other evidence. (R. 17 (citing 20 C.F.R. § 404.1571)).

At the January 7, 2019 administrative hearing, Plaintiff testified that he generally does not drive due to his lack of foot dexterity and concentration, that his wife handles the family finances, and that he could not work full-time due to his difficulties with concentration and walking and lack of strength in his right arm and leg. (R. 40-41). He indicated that he can only lift five pounds with his right hand due to pain and a lack of grip strength and that he has difficulty holding a pen or picking up small items with his right hand. (R. 47). He stated that his pain medications make him drowsy and cause him to take two or three naps lasting between 30 minutes and two hours. (R. 43). Plaintiff testified that he can only sit for 15 minutes and is most comfortable reclining. (R. 46-47). He claimed that he can walk for one-quarter to one-half of a mile before his foot starts to droop. (*Id.*). He stated that he stopped cooking after leaving the stove on a few times. (R. 47-48).

Plaintiff explained that he accompanies his wife grocery shopping for an hour before tiring and spends 10 to 15 minutes folding laundry about three or four times per week and 15 to 20 minutes operating a dustbuster once per week. (R. 43-45). He stated that he can shower on his own but requires help buttoning shirts. (R. 48). He attends church for 45 minutes once per month, which requires him to rise and sit repeatedly. (R. 49). He spends his days reading detective and history books, watching some television, straightening up around the house, and running errands with his wife. (R. 49-50).

### III.    ALJ DECISION

Following the administrative hearing held on January 7, 2019, the ALJ issued a decision in which she made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

    2.       The claimant has not engaged in substantial gainful activity since February 19, 2016, the alleged onset date.

    3.       The claimant has the following severe impairment: Stroke.

    4.       The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

    5.       After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to frequent climbing and balancing, and he is limited to frequent reaching with the right upper extremity.

    6.       The claimant is capable of performing past relevant work as a Supervisor, Truck-Trailer Assembly. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity.

    7.       The claimant has not been under a disability, as defined in the Social Security Act, from February 19, 2016, through the date of this decision.

(R. 12-27).

## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If she is not, then the

> Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, she is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

V.   **DISCUSSION**

In his request for review, Plaintiff raises a single claim: that the ALJ erred in determining that he was not disabled at any point since the alleged disability onset date of February 19, 2016. (Pl.'s Br., ECF No. 26, at 2-9).

A.   **The Parties' Arguments**

1.   **Plaintiff**

After summarizing the applicable background law, relevant record evidence and the ALJ's decision, Plaintiff takes issue with her description of Dr. Kolva as having "examined" Plaintiff because Dr. Kolva "followed the Plaintiff consistently" from the time of his stroke through the end of October 2017. (*Id.* at 7; *see also* R. 21). Similarly, he claims that the ALJ's reference to the lack of contemporaneous medical notes supporting the changes from the March 2018 Medical Source Statement to the November 2018 one is "misleading" because Dr. Kolva continued to prescribe him medication during this period, even if Dr. Kolva had stopped "actively treating" him as of the prior October. (Pl.'s Br., ECF No. 26, at 7). He denies any implication that the latter Statement was not based upon a current assessment of his condition because he visited Dr. Kolva on the date that Dr. Kolva completed it. (*Id.* at 7-8). He observes that, under the prior regulations in place when he filed his claim, a treating source's opinion is accorded controlling weight if it is well-supported by clinical and diagnostic techniques and is not inconsistent with other substantial evidence in the record and, if it is not given controlling weight, the opinion must be analyzed pursuant to the factors set forth in 20 C.F.R. Section 404.1527(c)(2)-(6).[4] (*Id.* at 8 (citing 20 C.F.R. § 404.1527, applicable to "claims filed before

---

[4] Plaintiff filed his claim for benefits on or about February 25, 2016. (R. 208-09). For claims filed on or after March 27, 2017, the ALJ will not give specific evidentiary weight, including controlling weight, to any medical opinions, even from a claimant's treating physician(s), but instead evaluates the persuasiveness of the source using a number of factors, the

March 27, 2017")).  Thus, he maintains that Dr. Kolva's November 2018 Medical Source Statement is entitled to controlling weight because it is allegedly supported by Plaintiff's self-reported symptoms, including the side effects he experiences from his medications.  (*Id.* at 9).  Plaintiff asserts that, pursuant to this opinion, his RFC should have been "far less" than the one determined by the ALJ and the ALJ should have found that he is unable to carry out any substantial gainful activity.  (*Id.*).

Plaintiff further alleges that the ALJ's characterization of his testimony is only "partially accurate" because she did not specify in her decision how much time Plaintiff spends folding laundry (10 to 15 minutes at a time) or operating a dustbuster (15 to 20 minutes at a time) or why he can only walk one-quarter of a mile (because his right leg becomes weak and droops).  (*Id.* at 8).  He concludes that this testimony, along with the November 2018 Medical Source Statement, "establish[es] that he is unable [sic] to perform neither his past relevant work nor any other substantial gainful activity."  (*Id.*).

### 2. The Commissioner

Pointing to Plaintiff's kayaking, fishing and employment during the alleged disability period, the Commissioner responds that substantial evidence supports the ALJ's finding that Plaintiff is not disabled because he is able to perform jobs existing in significant numbers in the national economy.  (Resp., ECF No. 29, at 5).  She asserts that substantial evidence also supports the ALJ's RFC determination and, in particular, the ALJ's treatment of Dr. Kolva's opinions.  (*Id.* at 6-11).  She observes that even under the prior regulations in place when Plaintiff filed his claim a treating physician's opinion is only controlling if it is both "well-supported" by accepted diagnostic techniques and otherwise "not inconsistent" with the other substantial evidence in the

---

most important being supportability and consistency.  20 C.F.R. § 404.1520c(a), (b)(2).

record. (*Id.* at 6 (quoting 20 C.F.R. § 404.1527(c)(2); citing *Plummer v Apfel*, 186 F.3d 422, 429 (3d Cir. 1999))).

The Commissioner maintains that the ALJ was justified in according "some weight" to Dr. Kolva's August 2017 opinion that Plaintiff should be given the opportunity to return to work on the basis of his ADLs, including his ability to shop with his wife, run errands, fold clothes, use a dustbuster, kayak, fish, and walk a quarter of a mile; contemporaneous treatment notes documenting Plaintiff's desire to return to work; and other treatment notes setting forth his plan to "develop his musculature" through kayaking, his "much better" arm pain after taking medication, and Dr. Kolva's conclusion that he had no further treatment to provide Plaintiff. (*Id.* at 8 (citing R. 21, 44-46, 49-50, 388, 390, 411)). She further contends that the ALJ properly accorded "little weight" to Dr. Kolva's 2018 opinions because his kayaking and fishing were inconsistent with his purported ability to lift only five pounds; because his testimony that he could walk one-quarter to one-half of a mile (without any mention of an assistive device) was inconsistent with his purported need for a cane; because in November 2018 Plaintiff had not visited Dr. Kolva for over a year but did so at that time so that Dr. Kolva "might fill out a form for his lawyer," even though "[m]any of the questions were not pertinent to his various conditions"; and because there were no treatment records between March and November of 2018 that explained why Plaintiff's condition "suddenly and precipitously plummeted to such an alleged extent" during that period, particularly when Dr. Kolva had noted at the last visit in October 2017 that no further treatment was warranted. (*Id.* at 8-9 (citing R. 21, 46, 388, 427-33, 438-44)). Citing several examples, the Commissioner observes that the Third Circuit regularly refuses, even under the prior regulations, to remand ALJ decisions that discount a treating source opinion due to inconsistencies with the rest of the record. (*Id.* at 10 (citations omitted)).

Instead, the Commissioner argues that the ALJ appropriately credited the opinion of Dr.

12

Legaspi, the state agency medical consultant. (*Id.* at 10-11). She highlights the ALJ's observation that Dr. Legaspi found that Plaintiff had restrictions reaching with his right hand but that he otherwise had fewer limitations than those determined by Dr. Kolva. (*Id.* at 11 (citing R. 20)). She contends that these restrictions and limitations, as determined by Dr. Legaspi, were consistent with Plaintiff's medical evidence showing right upper extremity weakness, as well as records demonstrating no significant stenosis or occlusion or acute cardiopulmonary abnormalities. (*Id.*).

      B.      **Substantial Evidence Analysis**

A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is defined as the relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). Substantial evidence consists of more than a mere scintilla of evidence, but is less than a preponderance of the evidence. *Pierce*, 487 U.S. at 565; *Morales*, 225 F.3d at 316.

The Third Circuit has instructed, "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. *Id.*; *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981).

It is not the role of the Court to re-weigh the evidence of record or substitute its own

13

conclusions for that of the ALJ. *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). If the ALJ's conclusion is supported by substantial evidence, this Court may not set aside the Commissioner's decision, *even if it would have decided the factual inquiry differently*. *Hartranft*, 181 F.3d at 360 (emphasis added). This presumption applies both to findings of fact and to inferences reasonably drawn from that evidence. *See Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("[w]here the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently").

The Court finds that the ALJ's decision is supported by substantial evidence. As Plaintiff notes, under the applicable prior regulations, the opinion of a treating physician, such as Dr. Kolva,[5] is controlling if, *inter alia*, it is not inconsistent with other substantial evidence in the record. (Pl.'s Br., ECF No. 26, at 8 (citing 20 C.F.R. § 404.1527(c)(2))). Here, the ALJ credited Dr. Kolva's August 2017 opinion that Plaintiff had the functionality to attempt a return to work because she found it consistent with his self-reported ADLs, including household chores,

---

[5] The Court agrees with Plaintiff that Dr. Kolva should be viewed as a "treating source" under 20 C.F.R. § 404.1527(a)(2). After treating with Dr. Kolva at the time of his stroke in February 2016, Plaintiff visited him at roughly two-month intervals throughout the remainder of 2016, followed by three visits in 2017. (R. 366-67, 388-93). At Plaintiff's last visit at the end of October 2017, Dr. Kolva indicated that he should return in six months, and Dr. Kolva continued to prescribe medication for Plaintiff. (R. 388). Plaintiff also visited Dr. Kolva on November 30, 2018. (R. 437). Although the purpose of this visit was for Dr. Kolva to "fill out a form for [Plaintiff's] lawyer," Dr. Kolva also referred Plaintiff at that time to a rheumatologist. (*Id.*). Pursuant to the applicable regulation, "[t]reating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527(a)(2). Overall, a court will find that a provider is a treating source where the claimant has "an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)." *Id.* The Court can discern no basis upon which Dr. Kolva should not be considered a treating source. He treated Plaintiff regularly for 20 months after his stroke, then continued to provide him medication and referrals thereafter. This interaction satisfies the "ongoing relationship" requirement of 20 C.F.R. § 404.1527(a)(2).

shopping, walking a quarter of a mile, and, perhaps most significantly, kayaking and fishing. (R. 21, 43-47, 388). She also found the opinion consistent with Dr. Kolva's contemporaneous medical notes and earlier medical records confirming no significant stenosis or occlusion within Plaintiff's intracranial circulation and no acute cardiopulmonary abnormality. (R. 21, 288, 320-22).

However, for many of the same reasons that the ALJ had credited Dr. Kolva's August 2017 opinion, she discounted Dr. Kolva's March and November 2018 opinions finding significant limitations in how long Plaintiff could sit, stand or walk, how much he could lift and carry, and his ability to use his right hand, balance, ambulate without a cane, and attend work regularly. (R. 21, 427-33, 438-44). Specifically, the ALJ again noted that Plaintiff reported shopping, walking a quarter of a mile, and performing household chores such as folding laundry and operating a dustbuster. (R. 21, 43-47). Plaintiff complains that the ALJ's summary of his testimony was incomplete because she did not explicitly restate the amount of time he spends folding laundry and operating a dustbuster (up to approximately 20 minutes each) or why he can only walk one-quarter of a mile (because of his right leg weakness), but "the ALJ need not mention every piece of relevant evidence in the record." *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 337 (E.D. Pa. 2004) (citing *Fargnoli*, 247 F.3d at 42). This is particularly true where "none of this evidence consists of findings contrary to the findings upon which the ALJ based his conclusion as to the severity of Plaintiff's impairments." *Id.* Here, the allegedly overlooked testimony does not conflict with the fact that Plaintiff engages in these activities, nor does it conflict with the fact, as the ALJ also reiterated, that Plaintiff was kayaking "to develop his musculature" and fishing, activities that are facially at odds with Plaintiff's purported inability to lift and carry over five pounds, walk without a cane or balance or use his right hand without significant limitations. (R. 388, 438-44). On these grounds, the ALJ chose to credit Dr. Kolva's

August 2017 opinion over his March and November 2018 opinions.  (R. 21).

      The ALJ's determination that Dr. Legaspi's June 2016 opinion was entitled to great weight was also supported by substantial evidence.  (R. 20-21).  Although ALJs "are not required to adopt any prior administrative medical findings, . . . they must consider this evidence" because "Federal [and] State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 404.1513a(b)(1); *see also* R. 20-21 ("Further, as a state medical consultant, Dr. Legaspi is familiar with Social Security Administration guidelines, policies, and regulations.").  As noted, Dr. Legaspi found that Plaintiff could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently, sit or stand and walk up to six hours in a workday, and frequently balance and climb ramps, stairs, ladders, ropes, and scaffolds, but that he had some limitations reaching with his right hand.  (R. 20, 67-69).  The ALJ explained that this opinion, and in particular the limitations regarding the use of the right hand, was consistent with Plaintiff's own testimony that he has difficulty gripping and holding things with that hand, as well as medical records finding right upper extremity weakness, particular in Plaintiff's grip.  (R. 20, 47).  She found the remainder of the opinion consistent with Plaintiff's ability to shop and medical records indicating a lack of significant stenosis or occlusion within the intracranial circulation or any acute cardiopulmonary abnormality.  (R. 20, 288, 320-22).  Accordingly, substantial evidence supports her decision to credit Dr. Legaspi's opinion on the basis that it was consistent with both the medical evidence and Plaintiff's own subjective statements regarding his symptoms.  (R. 21).

      Finally, Plaintiff urges that his RFC would have been "far less" if the ALJ had credited Dr. Kolva's March and November 2018 opinions over his August 2017 one and Dr. Legaspi's June 2016 opinion.  (Resp., ECF No. 26, at 9).  RFC is defined as the most an individual can still do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ's finding of RFC must "be

16

accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704-05 (3d Cir.1981) (explaining reasons why an administrative decision should be accompanied by clear and satisfactory explanation). In making an RFC determination, the ALJ must consider all evidence before him. *See Plummer*, 186 F.3d at 429. That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others. *See Fargnoli*, 247 F.3d at 41; 20 C.F.R. § 404.1545(a). Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See Plummer,* 186 F.3d at 429; *Cotter,* 642 F.2d at 705; *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).

Although Plaintiff does not specify what he believes his RFC should be, the ALJ found that Plaintiff was able to perform light work with additional limitations regarding climbing, balancing and reaching with his right arm. (R. 19). The ALJ cited substantial evidence for this determination. Specifically, she observed that a February 2016 hospital examination at the time of Plaintiff's stroke revealed right upper extremity weakness, especially in Plaintiff's grip. (R. 21, 295). But the ALJ accounted for this weakness in limiting how often Plaintiff could reach with his right arm and hand. (R. 19; *see Gurina v. Berryhill*, 336 F. Supp. 3d 524, 531 (E.D. Pa. 2018) ("once a limitation is determined to be 'credibly established,' the ALJ must accurately provide for it in the RFC") (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005))). Regarding the remainder of the RFC, she pointed out Plaintiff's radiology reports performed at the hospital showing a left lacunar infarct but otherwise demonstrating that he was stable for posttraumatic deformity and negative for intracranial mass hemorrhage. (R. 21, 297). The ALJ acknowledged Plaintiff's subjective testimony regarding his difficulties walking and lack of right arm and leg strength, but she discounted this testimony because Plaintiff kayaks to develop his

17

muscles and fishes, in addition to less physically taxing ADLs like folding laundry a few times per week, operating a dustbuster, and walking a quarter of a mile. (R. 21-22, 40-41, 43-47, 388; *see also Plummer,* 186 F.3d at 429 (noting that the ALJ must give some indication what evidence she discounts and why) (citing *Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir. 1983))).

Accordingly, the ALJ's decision is backed by substantial evidence. The Court therefore declines to remand this matter on the basis of its purported absence.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's request for review is **DENIED**. An appropriate Order follows.

BY THE COURT:

  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge